ACCEPTED
15-25-00023-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/9/2025 3:30 PM
CHRISTOPHER A. PRINE
CLERK



**KEN PAXTON**

ATTORNEY GENERAL OF TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/9/2025 3:30:14 PM
CHRISTOPHER A. PRINE
Clerk

June 9, 2025

Mr. Christoper A. Prine                                          *via E-Filing*
Clerk of the Court
Fifteenth Court of Appeals
P. O. Box 12852
Austin, TX 78711

> Re:   Court of Appeals Numbers: 15-25-00023-CV, 15-25-00031-CV, 15-25-00032-CV, 15-25-00039-CV

> Style:   *Nonparty Patients 1–11 v. State; In re State of Texas; In re State of Texas; Nonparty Patients 1–11 v. State.*

To the Fifteenth Court of Appeals:

The State writes this letter to inform the Court of a recent Supreme Court of Texas ruling that bears on certain issues before this Court in the above-captioned appeals. On May 30, 2025, the Supreme Court of Texas issued its ruling in *Paxton v. Annunciation House, Inc.*, No. 24-0573, attached here as Exhibit A. In light of the Court's ruling in that case, the State is no longer pursuing its sovereign immunity argument in the above-captioned appeals. The State is still pursuing its alternative arguments, including standing and the doctrine of dominant jurisdiction.

As a practical matter, this impacts each appeal in the following manner:

1. 15-25-00023-CV: The State is dropping its argument as to Argument Section I in its opening brief. The State maintains its argument as to Argument Section II.
2. 15-25-00031-CV: The State is dropping its argument as to Argument Section II.A. The State maintains all its other arguments in Argument Sections I and II.B and C.
3. 15-25-00032-CV: The State is dropping its argument as to Argument Section II.A. The State maintains all its other arguments in Argument Sections I and II.B and C.
4. 15-25-00039-CV: The State's arguments in its mandamus petition are unaffected by this change.

Sincerely,

*/s/ Abigail E. Smith*
Abigail E. Smith
Assistant Attorney General
Consumer Protection Division
Phone: (214) 290-8830
Abby.Smith@oag.texas.gov

cc:     William M. Logan, *via e-service*
        Jervonne D. Newsome, *via e-service*
        Evan D. Lewis, *via e-service*
        Thanh D. Nguyen, *via e-service*
        Olivia A. Wogon, *via e-service*
        Jonathan Hung, *via e-service*
        Hollie M. Albin, *via e-service*
        David Phillips, *via e-service*



Exhibit A

# Supreme Court of Texas

No. 24-0573

Warren Kenneth Paxton, Jr., in his Official Capacity as
Texas Attorney General, and the State of Texas,

*Appellants*,

v.

Annunciation House, Inc.,

*Appellee*

On Direct Appeal from the
205th Judicial District Court, El Paso County, Texas

**Argued January 13, 2025**

JUSTICE YOUNG delivered the opinion of the Court.

Justice Sullivan did not participate in the decision.

The attorney general has alleged that Annunciation House, Inc., an El Paso-based nonprofit corporation, violates Texas law by harboring illegal aliens. Invoking his statutory and constitutional authority, he has sought to examine Annunciation House's records to verify this allegation and to initiate quo warranto proceedings that, if the allegations are

proven, could lead to the revocation of Annunciation House's charter and preclude it from operating. Bound up in the dispute are a host of serious questions: What kind of conduct constitutes unlawfully harboring illegal aliens? Has Annunciation House engaged in such conduct? Under what conditions may the attorney general demand access to Annunciation House's records? Can harboring illegal aliens provide a valid basis for the attorney general to file a quo warranto action? Does Texas law that protects religious liberty forbid the attorney general from proceeding against Annunciation House under these circumstances? And more still.

Ordinarily, before this Court addresses such significant issues, the parties would have developed a full record and litigated the disputed questions in the trial court and then the court of appeals, after which the disappointed side would file a petition for review. This case, however, comes to the Court as a direct appeal because, very early in the litigation, the trial court held that several Texas statutes are unconstitutional. We accordingly must address this dispute far earlier than we typically would.

We conclude that the trial court erred in its constitutional holdings. We likewise conclude that the court's related injunctions, which prevent the attorney general from even filing a quo warranto action, were premature at best. Our primary holding is that the attorney general has the constitutional authority to file his proposed quo warranto action, which simply allows the usual litigation process to unfold. It is too early for us, or for any court, to express a view about the merits of the underlying issues. Perhaps the case will terminate quickly based on evidentiary or legal grounds; perhaps it will go to trial. Perhaps the Texas Religious Freedom Restoration Act will affect the proceedings in an

outcome-determinative way; perhaps that statute will end up playing no such role. We resolve only what we must to dispose of today's appeal, and beyond that, we do not foreclose the case's development on remand.

**I**

Annunciation House is a charitable organization based in El Paso, Texas, that operates several shelters around the city. Founded in 1976, Annunciation House has long worked with the Roman Catholic Diocese of El Paso to provide shelter to the homeless, particularly immigrants and refugees crossing over from Mexico. Called to serve the needy by its founders' Catholic faith, Annunciation House provides food and housing to its guests regardless of their immigration status.

On February 7, 2024, three state officials arrived at one of Annunciation House's shelters with a formal "Request to Examine" its records. The officials informed Annunciation House's director, Ruben Garcia, that the request covered a variety of internal files, that production must be immediate, and that failure to comply would result in forfeiture of Annunciation House's right to do business in Texas as well as a criminal penalty. *See* Tex. Bus. Orgs. Code §§ 12.155–.156. The officials agreed that Garcia could consult with an attorney before complying and, after providing a written copy of the request, departed the premises. Later that day, Annunciation House's attorney informed the attorney general's office that the shelter would respond to the record request within thirty days; the attorney general, however, demanded compliance by the next day. In response, Annunciation House turned to a district court in El Paso County to request a temporary restraining order and a declaratory judgment that the request violated Annunciation House's constitutional rights.

3

The trial court granted the requested temporary restraining order and set a hearing to consider granting a temporary injunction. The attorney general then filed a "Plea to the Jurisdiction, Answer, and Motion for Leave to File [[Proposed]] Counterclaim in the Nature of Quo Warranto."

Annunciation House then asked the trial court to extend the temporary restraining order, and the court granted the request. The court reset the hearing to March 7, when it would consider Annunciation House's requests for declaratory relief and a temporary injunction alongside the attorney general's responsive plea to the jurisdiction and motion for leave to file a quo warranto action. Three days after the hearing, the trial court held that the Rules of Civil Procedure superseded the attorney general's original records request, meaning that any production of records would now take place subject to discovery requests and rulings. The trial court stated that this mooted Annunciation House's requested injunction against being forced to immediately produce the records.

For the next several months, the parties engaged in discovery related to the two live pleadings: (1) Annunciation House's request for declaratory relief and a temporary injunction against further allegedly unconstitutional records requests; and (2) the attorney general's request for a temporary injunction and his motion for leave to file a quo warranto counterclaim seeking revocation of Annunciation House's charter. While the attorney general's initial petition and counterclaim relied on Annunciation House's failure to comply with the records request, his amended filings accused Annunciation House of engaging in "systematic conduct that constitutes illegal alien harboring and operation of a stash

4

house." On this new ground, the attorney general again requested a temporary injunction shutting down the shelter's operations and renewed his request for leave to file a quo warranto action seeking to revoke Annunciation House's charter.

Annunciation House moved for summary judgment. In two orders, the trial court granted the motion and denied the attorney general's requests for an injunction and for leave to file a quo warranto action. In granting summary judgment, the trial court held that the records-request statute, codified at Business Organizations Code §§ 12.151–.152, is facially unconstitutional under the First and Fourth Amendments to the U.S. Constitution and that the request made of Annunciation House in particular constituted religious harassment under Government Code § 2400.002. The trial court therefore granted declaratory relief and an injunction in favor of Annunciation House, which included the requirement that any further records requests first be filed with that court for precompliance review.

In denying the attorney general's requested injunction and motion for leave to file a quo warranto action, the trial court first held that the attorney general failed to establish the required grounds for a quo warranto proceeding under Civil Practice and Remedies Code § 66.002(d). It then held that the allegations of sheltering undocumented migrants, even if true, did not constitute illegal harboring under Penal Code § 20.05(a)(2) or § 20.07(a)(1), citing the Fifth Circuit's decision in *Cruz v. Abbott*, 849 F.3d 594, 597–602 (5th Cir. 2017). The court ruled in the alternative that §§ 20.05(a)(2) and 20.07(a)(1) are both field and conflict preempted by federal law, and thus unenforceable, including by

means of a quo warranto action.

As to quo warranto generally, the trial court held that Business Organizations Code § 11.301(a)(5) provides the exclusive means of terminating a corporation's existence for criminal violations, thus abrogating quo warranto in this area. Finally, as applied to Annunciation House, the trial court ruled that the quo warranto counterclaim would render both the quo warranto statute (§ 66.001) and the underlying Penal Code provisions (§§ 20.05(a)(2) and 20.07(a)(1)) unconstitutionally vague and would also violate the Texas Religious Freedom Restoration Act (which we refer to as RFRA) by impermissibly burdening the shelter's religious activity. *See* Tex. Civ. Prac. & Rem. Code § 110.003. Absent a lawful cause of action, let alone a probable right to relief, the trial court denied the attorney general's request to file the quo warranto counterclaim and the accompanying injunction.

A later order disposed of all other claims, reducing the orders described above into a final, appealable judgment. The attorney general appealed both orders directly to this Court, as authorized where "a trial court grant[s] or den[ies] an . . . injunction on the ground of the constitutionality" of a state statute. Tex. Gov't Code § 22.001(c); *see also* Tex. R. App. P. 57. We noted probable jurisdiction over the appeal, which challenges the following five holdings of the trial court:

(1) Business Organizations Code § 11.301(a)(5) abrogates the attorney general's authority to bring quo warranto actions;

(2) the attorney general fails to adequately allege violations of Penal Code § 20.05(a)(2) or § 20.07(a)(1);

(3) those provisions of the Penal Code are unconstitutionally vague as applied to Annunciation House or are preempted by federal law;

6

(4) the injunction that the attorney general requested and the quo warranto action he sought to file violate RFRA; and

(5) Business Organizations Code §§ 12.151 and 12.152 do not provide for precompliance review and are thus facially unconstitutional.

We address each argument, turning first to those pertaining to quo warranto in Part II and then to the arguments about the requested injunctions and the records request in Part III.

## II

This Court has not addressed the nature of a quo warranto action for more than a century. Given the procedure's relative obscurity, we briefly consider its history before addressing the parties' arguments.

## A

The earliest recorded quo warranto actions date from the thirteenth century, when King Edward I ascended the throne following several wars between the crown and rebellious barons. As part of a campaign to reduce feudal power and cement royal control, Edward ordered an investigation into the baronial "franchises." 1 W.S. Holdsworth, *A History of English Law* 87–88 (3d ed. 1922). "Franchises," which were then called "liberties," "were a miscellaneous lot," characteristically difficult to systematize given the feudal context in which they arose; "[m]ost liberties," however, "gave their owners the right to perform some [royal] function" or to "take some profit which normally belonged to the King." Donald W. Sutherland, *Quo Warranto Proceedings in the Reign of Edward I, 1278-1294*, at 2–3 (1963). Motivated to claw back his royal privileges (and, perhaps more importantly, the profits they reaped), Edward "sent out commissioners to enquire into these usurpations of

7

the royal rights." 1 Holdsworth, *supra*, at 88.

When the supposed abuses of royal power were documented, Edward's need for a new legal tool to go about righting them led to the first well-documented use of the writ of quo warranto. Issued by royal courts or "eyres" traveling throughout England, the writ "enquire[d] by what authority"—in Latin, *quo warranto*—a person "who claimed or usurped any office, franchise, liberty, or privilege belonging to the crown" maintained his right to do so. *Id.* at 229–30. Absent some proof of that right, usually in the form of a charter directly from the crown, or upon proof of "either mal-user or non-user," the eyre would revoke the claimed franchise back to the crown. *Id.* at 89. Following numerous high-profile revocations, and amid mounting resistance from aggrieved barons, Edward relented, first promulgating the Statute of Gloucester in 1278 and then the Statute of Quo Warranto in 1290. *Id.* at 88. Together, these allowed that proof of "possession [of a franchise] without interruption from the beginning of Richard I's reign" would adequately answer quo warranto and avoid revocation. *Id.* Nevertheless, "[t]he theory of the king and his lawyers, that no franchise could exist except by virtue of a royal grant, became the law for the future." *Id.*; *see also* Sutherland, *supra*, at 167.

Quo warranto lived on well past Edward's reign, and writs of quo warranto were issued from the medieval period onward. Over time, however, the writ of quo warranto gave way to the "information in the nature of quo warranto." Comment, *Quo Warranto and Private Corporations*, 37 Yale L.J. 237, 238 (1927). The information in the nature of a writ of quo warranto was, as its name suggests, "originally a criminal proceeding designed to punish the usurper of a franchise," akin

8

to the criminal information still used in Texas criminal procedure. *See* W.S. Holdsworth, *The History of the Criminal Information*, 1 Can. Bar Rev. 300, 301 (1923); *see also Ex parte Scott*, 123 S.W.2d 306, 311 (Tex. 1939) (collecting cases on the requirement to file "an information or complaint in writing" in criminal cases). Despite its criminal-law roots, however, the information in the nature of quo warranto "developed into a purely civil proceeding" and remains "exclusively" civil today. Holdsworth, *supra*, at 302.

The primary advantage of the formal shift to "the information" from "the writ" was that the attorney general could directly file the information with the Court of King's Bench, thus easing the burdens of the cumbersome traveling eyre and attendant procedure of the old prerogative writ. *Cf.* 1 Holdsworth, *supra*, at 229–30. No other substantive difference developed, so over time, "the information of quo warranto . . . became identical in scope with the older remedy, and the two have for all practical purposes become indistinguishable." *Quo Warranto and Private Corporations*, *supra*, at 238–39 (footnote omitted). Under either procedure, defendants had to show "by what authority" they purported to exercise some governmentally sanctioned power.

As the common law of corporations developed during the sixteenth and seventeenth centuries, private corporations—which existed only through express legislative authorization—were also subject to quo warranto actions. *See* 9 Holdsworth, *supra*, at 65 ("That a corporation could be suspended or dissolved, on proceedings taken against it by the crown for misuse or abuse of its privileges, was a very old principle of the common law."). Blackstone documented this use of quo warranto,

9

triggered by "negligence or abuse of [corporate] franchises; in which case the law judges that the body politic has broken the condition upon which it was incorporated," necessitating a quo warranto action "to enquire by what warrant the members now exercise their corporate power, having forfeited" it. 1 William Blackstone, *Commentaries* *473. This understanding of corporate law and quo warranto subsequently followed English lawyers to the American colonies. Several colonies, in fact, were founded as corporations, subject to quo warranto proceedings by the crown. *Cf.* Viola Barnes, *The Dominion of New England: A Study in British Colonial Policy* 23 (1923). Famously, the Court of King's Bench under Charles II issued a writ of quo warranto against the Massachusetts Bay Colony, thus revoking its charter in 1683 amid a period of friction with the crown. *See id.*

Quo warranto survived the American Revolution, too, with the People replacing the king as sovereign and a concomitant emphasis not on the abuse of a royal privilege but on a corporation's "special contractual relationship with the incorporating state." Herbert Hovenkamp, *The Classical Corporation in American Legal Thought*, 76 Geo. L.J. 1593, 1659 (1988). Nevertheless, *forfeiture* of a corporate charter (or "franchise") remained a possible result of quo warranto actions, justified on grounds of negligence or abuse—that is, the same ground Blackstone had documented in the eighteenth century. 1 Blackstone, *supra*, *473. As Justice Story put it in 1815, "a private corporation created by the legislature may lo[se] its franchises by a *misuser* or a *nonuser*[,] . . . and they may be resumed by the government under a judicial judgment upon a *quo warranto* to . . . enforce the forfeiture." *Terrett v. Taylor*, 13 U.S. (9

10

Cranch) 43, 51 (1815). Justice Story described this rule as "the common law of the land" and "a tacit condition annexed to creation of every such corporation." *Id.* On the same theme, Chief Justice Taney referred to franchises as "special privileges conferred by government upon individuals, . . . which do not belong to the citizens of the country, generally, of common right," meaning that "no franchise can be held which is not derived from a law of the state." *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 595 (1839).

Even as corporate law evolved over the nineteenth century, quo warranto remained a powerful common-law tool for addressing abuse of corporate charters. But changes in practice followed, too. For example, fewer corporations were chartered for a single specified purpose like building a railroad or operating a bank, as was typical in the days of Justice Story and Chief Justice Taney. More were chartered for general business purposes. *See* Hovenkamp, *supra*, at 1659–62. Accordingly, "non-user"—or failure to accomplish an express charter purpose—largely faded away as a ground for quo warranto actions. *Id.* Nevertheless, in the face of growing corporate power in the late-nineteenth and early-twentieth centuries, quo warranto was still generally regarded "as the sole remedy to test the right of a corporation to exist and to forfeit corporate charters and franchises on . . . grounds [of misuse or abuse]." 5 Seymour D. Thompson, *Commentaries on the Law of Private Corporations* 623 (2d ed. 1910); *see also Staacke v. Routledge*, 241 S.W. 994, 1000 (Tex. 1922) ("An inquiry into the abuse of . . . corporate power by the company can only be made by the state.").

Perhaps unsurprisingly, given quo warranto's long history and

11

ubiquity in Anglo-American law, the doctrine was part of Texas law from the beginning. In 1840, the Republic of Texas adopted "the Common Law of England" as the "rule of decision in this Republic" so far as it conformed to the recently adopted Constitution. Act approved Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Repub. Tex. Laws 3, 4, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 177–78 (1898). "In [that] adoption of the common law, we adopted the remedy of *quo warranto*, against corporations." *State v. S. Pac. R.R. Co.*, 24 Tex. 80, 116 (1859); *see also Banton v. Wilson*, 4 Tex. 400, 405–07 (1849). Given the attorney general's existing common-law authority, no statute directing the filing of quo warranto actions was necessary, but the legislature nonetheless both recognized its existence and made bringing a quo warranto information mandatory in certain circumstances. For example, an 1850 statute establishing the Texana Academy made it the attorney general's duty "to file an information in the nature of a quo warranto" if "at any time the [Academy] shall violate" its charter. 3 Gammel, *supra*, at 694 (Act of Jan. 2, 1850).

With the adoption of the present 1876 Constitution, the People of Texas took the further step of *constitutionalizing* the attorney general's power and duty to file quo warranto informations. At the suggestion of one delegate, George Flournoy, Article IV, § 22 was amended to add the following to a list of the attorney general's duties:

> and [the attorney general] shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporations from exercising any power, in demanding or collecting any species of tax, toll, freight, or wharfage not

12

> authorized by law; and shall, whenever sufficient cause exists, seek a practical forfeiture of such charters, unless otherwise expressly decreed by law.

*Debates in the Texas Constitutional Convention of 1875*, at 163–64 (Seth S. McKay ed., 1930). This text was slightly modified before its adoption, to "prevent any private corporations from exercising any power or demanding or collecting any species of tax . . . not authorized by law," and to separate off the final clause as a standalone sentence, beginning with "He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law[.]" Tex. Const. art. IV, § 22. The recorded debates do not illuminate any motivation for the original amendment or the subsequent edits. The only further relevant discussion appears to have concerned the fear of another delegate—John Stayton, a future chief justice of this Court—that the new duty "would be burdening the office of [attorney general] too much." *Debates in the Texas Constitutional Convention of 1875*, *supra*, at 164. In other words, there is at least some basis for understanding the original public meaning of § 22 as authorizing a commonplace—rather than rarely exercised—power.

Just six months after the Constitution's promulgation, the legislature statutorily directed the attorney general to exercise his new constitutional authority. Entitled "[a]n [a]ct to provide for the judicial forfeiture of charters, and prescribing the duties of the Attorney-General in relation thereto," the statute's first section largely copies Article IV, § 22's text. *Compare* 8 Gammel, *supra*, at 1148 (Act of Aug. 21, 1876), *with* Tex. Const. art. IV, § 22. Importantly, however, the statute also tracked the Anglo-American quo warranto practice described above by specifying the two traditional grounds for charter forfeiture: "mis-user

13

or non-user" by the corporation. 8 Gammel, *supra*, at 1148. The statute therefore confirms both that Article IV, § 22, though not using the words "quo warranto," was originally understood as constitutionalizing a quo warranto authority, as well as that this authority was substantively the same one long recognized at common law. *See Am. Indem. Co. v. City of Austin*, 246 S.W. 1019, 1023 (Tex. 1922) ("Legislative construction and contemporaneous exposition of a constitutional provision is of substantial value in constitutional interpretation.").

Three years later, the legislature enacted "[a]n act to prescribe the remedy and regulate the proceedings by quo warranto," which shed further light on what Article IV, § 22 empowered the attorney general to do. 9 Gammel, *supra*, at 75 (Act of July 9, 1879). The act authorized the attorney general to "present a petition to the district court . . . for leave to file an information in the nature of a quo warranto" on certain grounds. *Id.* This authority was triggered if, among other things, "any . . . persons shall act within this state as a corporation without being legally incorporated, or any incorporation does or omits any act which amounts to a surrender or a forfeiture of its rights and privileges as a corporation, or exercises power not conferred by law." *Id.* "[I]f such court or judge shall be satisfied that there is probable ground for the proceeding," the act continued, "the court or judge may grant the petition and order the information to be filed and process to issue." *Id.*

The act's articulation of the grounds for quo warranto mirrored § 22 by treating separately "exercis[ing] power" generally and specific bad acts, such as "charg[ing] an extortionate rate for the transportation of any freight or passengers, or refus[ing] to draw or carry the cars of any other

14

railroad company over its line as required by the laws of this state." *Id.* But either predicate action by the corporation was unlawful (whether "not conferred by law" or not in compliance with "the laws of this state") and could serve as grounds for a quo warranto information. *Id.*

With only minor reorganization, this portion of the 1879 act persists today as codified at § 66.001 of the Civil Practice and Remedies Code. That provision lies at the heart of the case now before us, as the attorney general relies on § 66.001(4) and (5) as grounds for the quo warranto counterclaim he seeks leave to file against Annunciation House. *See* Tex. Civ. Prac. & Rem. Code § 66.001(4), (5) (making quo warranto available if "a corporation does or omits an act that requires a surrender or causes a forfeiture of its rights and privileges as a corporation" or if "a corporation exercises power not granted by law").

Although the statute has not greatly changed in the century and a half since the 1879 act, corporate law has shifted away from state control and toward shareholders as the primary investigators of corporate malfeasance. *See* Hovenkamp, *supra*, at 1658. While the 1879 act allowed an action to be brought "either of [the attorney general's] own accord or at the instance of any individual relator," 9 Gammel, *supra*, at 43 (Act of July 9, 1879), shareholders today have many other tools to hold a corporation to account, so quo warranto has fallen into relative disuse as a tool for corporate supervision. Even so, quo warranto actions against private corporations are still filed by the attorney general in the lower courts, albeit more rarely, with one prominent example being the attempt to enjoin allegedly extortionate rates for telephone services by Southwestern Bell Telephone Company. *See State v. Sw. Bell Tel. Co.*, 526

15

S.W.2d 526, 531 (Tex. 1975) (citing Article IV, § 22 as authority for the attorney general to maintain the suit); *see also id.* at 533 (modifying the trial court's injunction granted in favor of the attorney general pursuant to his Article IV, § 22 authority). This Court has also ruled on quo warranto actions several times throughout the twentieth century by "refusing" writs, thus affording several appellate courts' opinions concerning informations the same precedential value as a decision of this Court. *See, e.g.*, *State v. Dilbeck*, 297 S.W. 1049 (Tex. Civ. App.—Austin 1927, writ ref'd).

Aside from corporate malfeasance—the basis for quo warranto actions the attorney general brings under Article IV, § 22—informations in the nature of quo warranto also continue to be filed in other areas, such as challenges to improper usurpation of an elected office, *see State ex rel. McKie v. Bullock*, 491 S.W.2d 659, 661 (Tex. 1973), or unlawful annexation of territory by a municipality, *see Mobil Oil Corp. v. Matagorda County Drainage Dist. No. 3*, 597 S.W.2d 910, 912 (Tex. 1980). Even then, however, quo warranto must still be pursued *governmentally*; where it is available, we recently reiterated that "the writ is exclusive and can only be brought by the attorney general, a county attorney, or a district attorney." *In re Dallas County*, 697 S.W.3d 142, 152 (Tex. 2024); *see also Alexander Oil Co. v. City of Seguin*, 825 S.W.2d 434, 436 (Tex. 1991) ("The only proper method for attacking the validity of a city's annexation of territory is by quo warranto proceeding, unless the annexation is wholly void."). Moreover, the Texas Constitution and state law currently authorize *direct* actions seeking a writ of quo warranto in this Court, *see* Tex. Const. art. V, § 3(a); Tex. Gov't Code § 22.002(a), although we appear to have entertained such requests on only a few occasions, always

denying the writ when we have done so, *see, e.g.*, *State ex rel. Angelini v. Hardberger*, 932 S.W.2d 489, 490–91 (Tex. 1996) (collecting previous cases and then denying the writ).

*   *   *

Summing up, quo warranto's common-law pedigree stretches back nearly eight centuries. That a corporate charter could be revoked via quo warranto "was the common law of the land" in the early United States, and in Texas too, through our State's adoption of the common law and by virtue of statutory enactments. More than that, those who framed and ratified our 1876 Constitution saw fit to elevate to a constitutional level the attorney general's twin powers to inquire into the misuse of charter rights and to file legal actions addressing such misuse. Finally, the legislature has provided important context on what those duties include by providing statutory grounds for quo warranto to address a variety of corporate misdeeds. Neither the constitutional provision nor the statute has been materially modified for nearly 150 years.

**B**

It is with this history of quo warranto in mind that we turn to the parties' arguments regarding whether the trial court properly denied the attorney general leave to file an information. We proceed in four main steps:

- First, we address Annunciation House's arguments that other provisions of Texas law have displaced the attorney general's authority to pursue quo warranto in this case. We conclude that they have not.

- Second, we turn to whether the asserted insufficiency of the evidence of an underlying violation of the Penal Code made it proper to deny the attorney general leave to even file a quo

17

warranto action here. We explain the proper standard for assessing motions for leave and conclude that evidentiary arguments like the ones raised here are premature and thus not a proper basis for the trial court to deny leave.

- Third, we address whether RFRA requires the early termination of proceedings ordered below. Even if RFRA turns out to play a significant role in this case—an outcome that we by no means foreclose—its role is not to stop the attorney general from even filing the information, at least under circumstances like those here.

- Finally, we address whether leave to file quo warranto should be denied in this case because the statute underlying the attorney general's quo warranto filing is preempted by federal law or is unconstitutionally vague. We find no merit in either contention.

Before explaining these holdings, we emphasize what is not pending before the Court: any question about Annunciation House's actual conduct or whether Annunciation House's corporate charter should be revoked. It bears repeating that we review only the denial of the attorney general's motion for "leave to file" a quo warranto action—a filing that would only begin the legal process for the attorney general to seek revocation. In other words, the question before us is whether the district court properly refused to allow the attorney general even to initiate the litigation process that may potentially lead to revocation. Our holding that the attorney general may begin the process of seeking charter revocation says nothing, therefore, about whether the attorney general will be entitled to that relief or even how far the case will proceed before the question is resolved through the normal process of litigation. *See S. Pac. R.R. Co.*, 24 Tex. at 119 ("Whoever must exercise this preliminary right, its exercise is not conclusive; for the facts that determine the forfeiture, must be ascertained through the judiciary, 'by

18

due course of the law of the land.'" (citation omitted)).

Said more simply, the question reduces to whether the attorney general may file a lawsuit. Framed that way, our answer—that the attorney general may do so—should sound rather unremarkable. Our holding is limited to that narrow question. Direct appeals, in particular, warrant deciding no more than absolutely necessary; going beyond that would short-circuit the normal appellate process to which the parties will be entitled based on the results of any proceedings on remand.

With these important caveats, we turn to the parties' arguments regarding purported obstacles to the filing of a quo warranto information against Annunciation House. We begin with those arising from the Business Organizations Code and the Civil Practice and Remedies Code.

**1**

The trial court held that Business Organizations Code § 11.301(a)(5) "supplants" the attorney general's power to bring a quo warranto action for illegal corporate acts. It also held that the attorney general failed to plead any of the grounds for quo warranto informations provided in Chapter 66 of the Civil Practice and Remedies Code. We do not read the text of § 11.301(a)(5) to sweep so broadly, nor that of Chapter 66 to cover so little, so we disagree with both holdings. Even if we had any doubts, moreover, the doctrine of constitutional avoidance would resolve them *against* the district court's conclusions because Article IV, § 22 requires that legislative withdrawal of quo warranto authority be stated "expressly."

**a**

Section 11.301(a)(5) allows a court to "enter a decree requiring winding up of a filing entity's business and termination of [its] existence

19

if, as the result of an action brought under Section 11.303," the court finds that the "public interest requires winding up and termination of the filing entity" based on three criteria listed in subparts (A), (B), and (C). Tex. Bus. Orgs. Code § 11.301(a)(5)(A)–(C). These criteria are that "the filing entity has been convicted of a felony" or "a high managerial agent" has been "convicted of a felony committed in the conduct of the filing entity's affairs"; that "the filing entity or . . . agent has engaged in a persistent course of felonious conduct"; and that "termination is necessary to prevent future felonious conduct of the same character." *Id.* In the trial court's view, by creating this scheme governing the dissolution of a corporation for felonious conduct, the legislature impliedly precluded the attorney general from achieving the same goal through a quo warranto action. Annunciation House makes the same argument in this Court, describing § 11.301(a)(5) as "the Legislature's policy determination" that a corporation's charter may only be revoked after "at minimum . . . a conviction, not merely an accusation." (Emphasis omitted.)

Chapter 66, as we have already noted, is the recodified, and essentially unchanged, 1879 "act to prescribe the remedy and regulate the proceedings by quo warranto." *Compare* Tex. Civ. Prac. & Rem. Code §§ 66.001–.003, *with* 9 Gammel, *supra*, at 75 (Act of July 9, 1879). The only innovation that came with codification was to itemize the stated grounds for quo warranto by placing them into a numerical list, subsections (1) through (7). The trial court held that the attorney general "failed to establish probable grounds for the proceedings under . . . § 66.002(d)" of that chapter, referring to the grounds outlined in § 66.001(1)–(7). Two of those grounds are relevant here: subsection (4)

20

provides that quo warranto is available if "a corporation does or omits an act that requires a surrender or causes a forfeiture of its rights and privileges as a corporation," while subsection (5) says the same if "a corporation exercises power not granted by law." Annunciation House claims that because neither subsection expressly mentions criminal activity, the alien harboring alleged by the attorney general cannot be grounds for quo warranto under Chapter 66 and reliance on such grounds is therefore impliedly forbidden by it.

Finally, Annunciation House asserts (albeit in a single footnote) that the attorney general's Article IV, § 22 powers are irrelevant to the holdings described above because that constitutional provision does not authorize bringing quo warranto actions based on predicate criminal acts. Stated differently, the argument appears to be that we should not hesitate to read either § 11.301 or Chapter 66 to materially limit the attorney general's quo warranto power where criminal acts are concerned, as Article IV, § 22's text never granted the attorney general quo warranto authority over such acts in the first place. On this view, the appeal would present no constitutional question as to the attorney general's authority, making it a matter of pure statutory construction to affirm the trial court's orders in this respect. Because this argument would, if accepted, color the rest of our analysis in Annunciation House's favor, we address it first.

**b**

Asked to decide a constitutional provision's scope, we begin with its text. In relevant part, Article IV, § 22 provides that the attorney general

> shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and

21

necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law . . . .

Tex. Const. art. IV, § 22. The provision does not deploy the term "quo warranto informations," but neither party disputes that the authority referred to in Article IV, § 22 is quo warranto authority, as we have treated it for well over a century. *See, e.g., State v. Int'l & Great N. R.R. Co.*, 35 S.W. 1067, 1068–69 (Tex. 1896).

Annunciation House asks us to limit Article IV, § 22's scope by construing its reference to the "exercis[e]" of "any power . . . not authorized by law" to cover only "demanding or collecting any species of taxes, tolls, freight or wharfage." On that reading, because the alien-harboring allegations here have nothing to do with illegally charging tolls, the attorney general's constitutional authority could not be implicated by the denial of his counterclaim based on those allegations. Reading Article IV, § 22 to mean that the attorney general has no constitutional authority where *only* criminal conduct is alleged as a predicate ground for a quo warranto action, Annunciation House argues, would alleviate any constitutional concerns in this case.

We find such a cramped construction inconsistent with Article IV, § 22's plain text, which empowers the attorney general to "take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power *or* demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law." Tex. Const. art. IV, § 22 (emphasis added). The three verbs—"exercising,"

22

"demanding," and "collecting"—are separated by the conjunction "or," and the object of each verb is modified by the final phrase "not authorized by law." Each object in the list is so modified—otherwise, quo warranto would be available whenever a corporation "exercis[es] any power" at all. The clause therefore separately contemplates the exercise of a power not authorized by law, the demanding of taxes not authorized by law, and the collecting of taxes not authorized by law. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) (describing the "series-qualifier" canon of construction). The text clearly severs "exercising" power from either "demanding" or "collecting" taxes, and so its plain reading is irreconcilable with Annunciation House's proffered interpretation.

We see no reason to abandon the text's plain import by treating the latter half of the series—dealing with taxes and tolls—as somehow constraining the former, which on its face addresses corporate power generally. Annunciation House also points to a different provision of the 1876 Constitution, which separately contemplated corporations "demanding . . . charges . . . [not] authorized by law." *See* Tex. Const. of 1876, art. XII, § 4 (repealed Aug. 5, 1969). But we think that citation cuts *against* Annunciation House's position. Article XII, § 4 did not mention the "exercise of power" at all. It dealt only with tolls charged "for the use of property devoted by the public." *Id.* It is difficult to see why the "exercise of . . . power" in Article IV, § 22 should be read as intrinsically bound up with that provision's additional reference to tolls and taxes, given that the framers overtly treated "exercising" power and "collecting" tolls separately in differing provisions of the same instrument. And if the exercise of power

23

in Article IV, § 22 refers only to corporate taxation, it would be equally surprising, just three years after § 22's adoption, for the legislature to have treated the two topics separately in the statutory progenitor of Civil Practice and Remedies Code § 66.001, listing the exercise of power "not granted by law" and illegal rate-setting as wholly separate grounds for a quo warranto action. *See* 9 Gammel, *supra*, at 75 (Act of July 9, 1879).

In short, we cannot accept Annunciation House's invitation to read Article IV, § 22's text to say so little. As far as we can see, this Court has not previously needed to opine about whether corporate criminal acts may constitute the exercise of power "not authorized by law" within Article IV, § 22's ambit. But the logically inverse position—that criminal acts could somehow be *authorized* by law—is difficult to accept. Perhaps it is unsurprising, then, that the supreme courts of other states have held unanimously from the late nineteenth century onward that violating criminal law can constitute the exercise of powers not conferred by law. *See, e.g.*, *State v. Neb. Distilling Co.*, 46 N.W. 155, 159–60 (Neb. 1890); *State v. Fid. & Cas. Co.*, 42 N.W. 509, 510 (Iowa 1889); *State ex rel. Snyder v. Portland Nat. Gas Co.*, 53 N.E. 1089, 1090–92 (Ind. 1899); *State ex rel. Monnett v. Cap. City Dairy Co.*, 57 N.E. 62, 66 (Ohio 1900); *see also People v. White Circle League of Am.*, 97 N.E.2d 811, 815–16 (Ill. 1951) (collecting additional cases). We are aware of no exception, and Annunciation House has cited none.

Notably, several of these cases concerned statutes with wording nearly identical to Article IV, § 22 and § 66.001 of the Civil Practice and Remedies Code—that is, contemplating the exercise of power not granted by law. *See Fid. & Cas. Co.*, 42 N.W. at 510 ("exercising powers not

conferred by law"); *see also Portland Nat. Gas Co.*, 53 N.E. at 1090 ("exercises powers not conferred by law"). The holdings can inform our understanding of Article IV, § 22's text because they indicate that the original public meaning of the phrase "exercising any power not authorized by law" included a corporation's committing at least some criminal acts at the time the 1876 Constitution was adopted. *Cf. Am. Indem. Co.*, 246 S.W. at 1023. This, in turn, means that addressing criminal acts by corporate entities does not fall outside the attorney general's power to "enquire" and to "seek a judicial forfeiture" of corporate charters protected by the Constitution, but rather is within it. As a result, that authority is subject only to those limitations "expressly directed" by the legislature, as Article IV, § 22 makes plain.

We therefore hold that criminal acts are not categorically excluded as predicates for the invocation of the attorney general's authority to file a quo warranto action. Whether *all* or *any* criminal acts may be a predicate is a wholly different question, one we need not resolve in this case. To the extent that there are valid historical or legal arguments casting doubt on whether any *particular* criminal-act predicate does not fall within the constitutional text, we neither foreclose the question on remand nor suggest what the answer may be. What we do foreclose is the argument that Annunciation House successfully advanced below and defends in this Court: that criminal conduct cannot be grounds for a quo warranto action.

Annunciation House further argues that it is the legislature, and not the attorney general, that decides when "sufficient cause exists [to] seek a . . . forfeiture." *See State v. Farmers' Loan & Tr. Co.*, 17 S.W. 60,

25

64 (Tex. 1891) (holding that § 22 "does not determine what facts, in a given case, will authorize him to bring and maintain a suit or action"); *see also S. Pac. R.R. Co.*, 24 Tex. at 116 (explaining that the State may "declare[], by its legislature, that a particular act of malfeasance" requires forfeiture). In one important sense, of course, the principle undergirding this argument is surely true: Article IV, § 22 is built on the premise that the legislature *can* draw the lines that determine when quo warranto is mandatory, permissible, or unavailable.

But to prevail, Annunciation House must make the quite different argument that quo warranto is not available under Article IV, § 22 *until* the legislature specifies that particular acts constitute "sufficient cause." The attorney general, in response, argues that the determination of sufficient cause is within his discretion. We largely agree with the attorney general: "sufficient cause" in Article IV, § 22 refers to his discretion under existing law without depending on specific determinations by the legislature, *so long as* the legislature has not clearly withdrawn a particular kind of action from quo warranto's reach.

We have already rejected essentially the same argument Annunciation House makes here in *State v. Teachers Annuity Life Insurance Co.*, 149 S.W.2d 318 (Tex. Civ. App.—Beaumont 1941, writ ref'd). There, in a "suit to decare void and to cancel [a] corporate charter," the attorney general alleged that an insolvent life-insurance company had unlawfully secured its capital stock with equity in real estate instead of property permitted by an insurance statute. *Id.* at 318. The insurance company argued that the attorney general had no power to bring a quo warranto action on the basis of the insurance-statute violation, as

26

"complete regulatory power and control of insurance companies and the business of insurance in general" was vested in a "Board of Insurance Commissioners." *Id.* at 320. The Beaumont Court of Appeals disagreed and, quoting Article IV, § 22, held that it is "the duty of the Attorney General to seek judicial forfeiture of corporate charters 'whenever sufficient cause exists.'" *Id.* In line with our analysis above, the court held that "[t]he general authority so conferred is limited only by the added proviso 'unless otherwise expressly directed by law'" and persists "unless and until the legislature expressly provides otherwise." *Id.* (quoting Tex. Const. art IV, § 22). But more importantly for our present purpose, it further held "that the attorney general . . . has the power to determine the existence of 'sufficient cause.'" *Id.* We subsequently approved of this analysis by refusing the ensuing writ, adopting the opinion as binding precedent. *See id.* at 318.

*Teachers Annuity* thus held almost the polar opposite of Annunciation House's position on the availability of quo warranto: that, rather than awaiting legislative authorization, the attorney general's authority to investigate corporate charters via quo warranto actions exists until expressly *limited* by legislative enactments, and that determining sufficient cause to file an action is within his sole discretion where no such limitation forecloses it. *See id.* at 319–20. This grant of discretion sits comfortably with the principle found throughout our case law that "as the chief legal officer of the state, [the attorney general] has broad discretionary power in conducting his legal duty and responsibility to represent the State," power that may not lightly be second-guessed by coordinate branches of government. *Terrazas v. Ramirez*, 829 S.W.2d

712, 721–22 (Tex. 1991) (first citing Tex. Const. art. IV, § 22; and then citing Tex. Gov't Code § 402.021); *see also Maud v. Terrell*, 200 S.W. 375, 376–77 (Tex. 1918); *Lewright v. Bell*, 63 S.W. 623, 623–24 (Tex. 1901).

On this point, we recently reiterated that "the office of the attorney general 'is one of ancient origin,'" whose "powers have deep roots" and whose "duties remain 'multifarious, necessarily involving at all times the exercise of broad judgment and discretion.'" *Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 495 (Tex. 2024) (alterations incorporated) (quoting *Charles Scribner's Sons v. Marrs*, 262 S.W. 722, 727 (Tex. 1924)). *Webster* was not a quo warranto case, but its holding implicated the attorney general's core authority to exercise constitutionally conferred discretion in filing pleadings on behalf of the State. *See id.* at 483–84. The attorney general's discretion to file pleadings can only be more firmly protected in the context of quo warranto, where "inquir[ing] into the charter rights of corporations" and seeking revocation in court is an *explicit* power conferred by the constitutional text, *see* Tex. Const. art. IV, § 22, as opposed to the *implicit* power of "judgment and discretion" that we recognized in *Webster*, *see* 704 S.W.3d at 495. This protection undergirds the reasoning of *International & Great Northern Railroad Co.*, where we held that Article IV, § 22 was sufficiently protective of the attorney general's quo warranto authority as to make it exclusive. *See* 35 S.W. at 1068–69. Thus, even if district or county attorneys may invoke quo warranto for some purposes, the legislature may not authorize them (or anyone other than the attorney general) to do so for investigating corporate malfeasance. *See id.* We are not called upon, of course, to reaffirm or contextualize that particular holding—but it does show the

28

Court's longstanding recognition that the attorney general starts with a strong presumption of exclusive authority where quo warranto filings are concerned.

Taken together, the foregoing reflects that the constitutional text, our long-standing precedent, and the historical record all confirm the attorney general's constitutional authority to *seek* charter revocation via quo warranto actions on various grounds that can include violations of criminal law.  To be sure, that authority is subject to general legislative oversight in that the legislature may require quo warranto informations to address any "particular act of malfeasance," *S. Pac. R.R. Co.*, 24 Tex. at 116, or "expressly direct[]" that quo warranto is unavailable in certain cases, *see* Tex. Const. art. IV, § 22.  But the attorney general's power to bring a quo warranto action does not *require* any separate legislative authorization or determination that "sufficient cause" exists to exercise it.  As a matter of constitutional law, then, our inquiry at this early stage thus reduces to whether the trial court's orders preventing the exercise of that authority relied on a limit "expressly directed by law."  *Id.*

### c

To answer that question, we first note that Article IV, § 22's "unless otherwise expressly directed by law" provision is apparently unique within our Constitution, unambiguously mandating a clear-statement rule for restrictions on the attorney general's quo warranto power.  Clear-statement rules are no rare creature in constitutional law, of course, but they are generally adopted by the *judiciary* where the required clarity "ensure[s] that the government does 'not inadvertently cross constitutional lines.'"  *West Virginia v. EPA*, 597 U.S. 697, 742

29

(2022) (Gorsuch, J., concurring) (quoting Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 175 (2010)).

But here, the Constitution *directly* imposes a clear-statement rule, presumably to prevent either the legislature from unintentionally abrogating the attorney general's quo warranto authority or the judiciary from broadly reading statutes as impliedly limiting that authority in the absence of "express[] direct[ion] by law." Broadly reading any statute to limit, let alone to entirely abrogate, quo warranto risks treading not only on the attorney general's authority, then, but on the Constitution's *independent* safeguard of that authority behind its clear-statement rule. Accordingly, erroneously reading a statute to impair that authority would be an error of constitutional magnitude, and we will not adopt a statutory reading that risks such an impairment if another plausible reading is available. *Cf. Borgelt v. Austin Firefighters Ass'n*, 692 S.W.3d 288, 303 (Tex. 2024) ("The doctrine of constitutional avoidance . . . require[s] us to give . . . a construction that steers clear of such constitutional difficulties unless the text foreclose[s] that construction."). For Annunciation House to show its exemption from quo warranto scrutiny by virtue of a legislative enactment, the statute it invokes must be inescapably clear.

The statutes offered below for this purpose are § 11.301 of the Business Organizations Code and Chapter 66 of the Civil Practice and Remedies Code. We address each in turn.

Beginning with § 11.301 of the Business Organizations Code, we note that nothing in that provision mentions the kind of authority described by Article IV, § 22—that is, quo warranto authority. The statute does not state that the contemplated "judicial winding up" procedure

constitutes a quo warranto action or that it has entirely replaced such actions when the predicate for bringing them arises under criminal law. It shares no language with Article IV, § 22 or Chapter 66. We struggle to see how statutory silence in § 11.301 as to the attorney general's Article IV, § 22 authority could possibly qualify as a limitation "expressly directed by law," satisfying that provision's clear-statement rule.

To the contrary, § 11.301's silence about any intent to limit quo warranto authority makes it unlikely that it could overcome the canon that "statutes will not be interpreted as changing the common law unless they effect the change with clarity." Scalia & Garner, *supra*, at 318. If § 11.301 cannot even meet that far lower standard, namely that its "'express terms *or necessary implications*' . . . indicate clearly the Legislature's intent to abrogate" the attorney general's *common-law* quo warranto authority, *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 428 (Tex. 2017) (emphasis added) (quoting *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000)), it certainly cannot satisfy Article IV, § 22's demand that the withdrawal of authority be "expressly" stated. The trial court therefore erred in concluding that § 11.301 expressly limits the attorney general's quo warranto power, much less entirely "supplants" it.

Annunciation House contends that construing § 11.301(a)(5) not to abrogate quo warranto actions based on alleged criminal acts leads to absurd results. *See Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 718 (Tex. 2024) (stating that courts "apply the common, ordinary meaning of [a statute's] words 'unless the text supplies a different meaning or the common meaning leads to absurd results'" (citation omitted)). If quo

31

warranto revocation is available even where the criminal acts would not allow winding up under § 11.301(a)(5), the argument goes, an acquitted corporation could be closed through quo warranto but not under § 11.301(a)(5). If so, Annunciation House claims, an acquitted corporation would be easier to close than a convicted one, creating an absurd and inequitable imbalance.

We disagree with the premise and see no circumstance in which quo warranto's existence alongside § 11.301(a)(5) creates absurdity. The two legal pathways are distinct. If § 11.301(a)(5) applies, a corporation is never better off to be convicted rather than acquitted; quo warranto proceedings, in turn, do not depend on there being any actual criminal prosecution at all. Moreover, as the attorney general emphasizes, § 11.301 is part of a larger scheme within Chapter 11 of the Business Organizations Code, which largely governs when the *secretary of state*— the official primarily responsible for the filing of corporate charters— must recognize or effect the winding up of a corporate entity. Reading § 11.301(a)(5) as creating a limited, mandatory mechanism to revoke charters because of criminal activity, shared between the attorney general and the secretary of state subject to Chapter 11's unique structure, strikes us not as absurd but as consonant with our duty to harmonize statutes and to interpret them "in a manner that avoids constitutional infirmity." *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998). Because § 11.301 does not even "expressly" *limit* quo warranto, we again cannot agree with the trial court's holding that the provision entirely "supplants" the attorney general's quo warranto authority.

Turning to Chapter 66, we note that the chapter both mentions quo

warranto and clearly addresses the attorney general's Article IV, § 22 powers. But it is not styled as a limitation on quo warranto and has never been so understood since its initial adoption in 1879. *See supra* Part II.A (discussing the statute). Instead, it expressly authorizes such proceedings on particular grounds. *See* Tex. Civ. Prac. & Rem. Code § 66.001 ("An action in the nature of quo warranto is available if . . . ."). Unlike the silent § 11.301, then, § 66.001 presents a more straightforward case for the *expressio unius* canon of construction, at least making it plausible that, by "expressing [several items] of [the] commonly associated group" (here, the several grounds for quo warranto), the statute meant to "exclude[] [others] left unmentioned" (here, criminal-law violations). *See United States v. Vonn*, 535 U.S. 55, 65 (2002). *Expressio unius*, however, relies on "[t]he force of . . . *negative* implication," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (emphasis added), and is of little use where the Constitution itself recognizes only a *positive* limitation—that is, that only a limitation that is "expressly directed" will do, Tex. Const. art. IV, § 22.

Even assuming for argument's sake that § 66.001 can (and does) impliedly forbid any unmentioned grounds for quo warranto, that would still not justify rejecting the filing here. Recall that one of § 66.001's grounds—namely, subsection (5)'s reference to the exercise of "power not granted by law"—is worded identically to the key language in Article IV, § 22 (and to other late-nineteenth century quo warranto statutes discussed above, including the 1879 act). We have already held that the phrase "exercising any power . . . not authorized by law" in Article IV, § 22 does not categorically exclude violations of the criminal law. Put

33

differently, Article IV, § 22 does not foreclose criminal acts from being predicate grounds for a quo warranto filing, and any limits on the quo warranto authority that might exist because of nearly identical language in Chapter 66 obviously may not have that result either. We therefore cannot affirm the trial court's order holding that the attorney general failed to plead a "probable ground" for a quo warranto counterclaim merely because that claim relied on criminal acts.

*   *   *

Both inherently under the common law and expressly under Article IV, § 22, the attorney general has substantial discretion to *file* quo warranto actions, and this authority does not categorically exclude actions predicated on alleged corporate criminal-law violations. The power existed at common law until "expressly reserved," *S. Pac. R.R. Co.*, 24 Tex. at 121, and exists in Texas as a matter of constitutional law "unless otherwise expressly directed by law," Tex. Const. art. IV, § 22. But the power to *seek* quo warranto can be exercised only through the courts, which must ultimately decide whether charter revocation is warranted; merely filing an action does not itself entitle the attorney general to that remedy. *See S. Pac. R.R. Co.*, 24 Tex. at 119; *see also Farmers' Loan & Tr. Co.*, 17 S.W. at 64 (holding that "the final inquiry must in all cases be made in and through the courts, as to whether . . . the corporation has exercised a power not given by its charter or the general laws of the state").

Applying these principles here, we hold that the attorney general acted within his constitutional authority when he sought leave to file a quo warranto counterclaim based on alleged criminal acts by Annunciation House. Because § 11.301 does not expressly limit the attorney general's quo warranto authority, and because the attorney general complied with

34

any limitation imposed by Chapter 66 of the Civil Practice and Remedies Code, neither statute justifies rejecting the counterclaim's filing, and the trial court erred in reaching the contrary conclusion.

## 2

Annunciation House next argues that even if violations of the alien-harboring statute may serve as predicate grounds for a quo warranto action, the attorney general failed to adequately allege such a violation here. On this point, the parties vigorously dispute the evidence, but weighing the evidence is improper at this preliminary stage. As we explain, whether to grant leave to the attorney general to file a quo warranto action presents a legal question: whether the petition on its face fails as a matter of law. Evidentiary questions or debates about how legal requirements apply to the facts are therefore outside the scope of the initial decision to grant leave to file. The usual tools of litigation exist in the quo warranto context, too; as in all other cases, those tools may generate early resolution of a quo warranto action.

Notably, the parties have not cited a decision of this Court that followed a trial court's *denial* of leave to file—as far as we can see, every case has started with the trial court granting leave. We are not surprised by that imbalance because granting the attorney general's request for leave to file a claim within his core constitutional authority should be the norm. *Cf. Webster*, 704 S.W.3d at 500. Quo warranto's additional procedural requirement—to seek leave to file—is unaccompanied by specific guidance about the contents or requirements of initial filings from either Article IV, § 22 of the Constitution, Chapter 66 of the Civil Practice and Remedies Code, or our rules of procedure. As the Austin Court of

35

Appeals has aptly observed, "no statute, rule, or caselaw explicitly requires the State to verify its petition [for quo warranto] or support it with evidence." *State v. City of Double Horn*, No. 03-19-00304-CV, 2019 WL 5582237, at *4 (Tex. App.—Austin Oct. 30, 2019, pet. denied).

Most of these matters can be handled by analogizing to civil litigation generally. Long ago, when confronted with whether quo warranto's quasi-criminal origins affect how an information is to be treated procedurally, this Court clarified that it "is to be treated as a civil suit" subject to "the rules of practice" in general use. *Davis v. State ex rel. Wren*, 12 S.W. 957, 958 (Tex. 1889). And as to assessing a motion for leave in particular, this Court has at least provided basic guidance. In *Hunnicutt v. State ex rel. Witt*, we distinguished between evidence adduced in seeking simply to *file* an information and the merits of the quo warranto action itself, holding that the former "establishes no facts on which the merit of the [latter] rests; these must be established by evidence on final trial." 12 S.W. 106, 108 (Tex. 1889). Crucially, we concluded, the attorney general's "official statement, unsworn, would be sufficient to authorize a judge" to file the requested information. *Id.*

Consistent with this premise, the courts of appeals appear to uniformly apply a sufficiency-of-the-pleadings standard, in which "the trial court must accept as true the allegations contained in the State's petition . . . and 'need only find that the petition stated a cause of action to proceed.'" *City of Double Horn*, 2019 WL 5582237, at *4 (quoting *Ramirez v. State*, 973 S.W.2d 388, 393 (Tex. App.—El Paso 1998, no pet.)); *see also State ex rel. Manchac v. City of Orange*, 274 S.W.2d 886, 888 (Tex. App.—Beaumont 1955, no writ) ("If the petition sought to be filed state[s]

a cause of action, the court [is] in error in refusing permission to file it.").

We approve this standard as consistent with our case law, the statutory requirements of Chapter 66, and the larger context of civil litigation in general and quo warranto actions in particular. The current statute requires only a "probable ground for the proceeding" to justify filing. *See* Tex. Civ. Prac. & Rem. Code § 66.002(d). Filing the action merely opens the door to the litigation process, which requires probative evidence for the attorney general to prevail. *See Hunnicutt*, 12 S.W. at 108. A motion for leave is therefore not an opportunity to litigate the entire case before it is even filed. Rather, it authorizes a limited facial attack to weed out filings that, due to some legal defect, cannot survive even though the court assumes the truth of the allegations.

Though deferential, this standard is not a mere rubber stamp on the attorney general's motion for leave. If a requested quo warranto filing alleges no conduct that Texas law actually proscribes, for example, the trial court may deny leave to file. In at least one case, we held that the trial court was too generous in granting leave for just that reason. *See Queen Ins. Co. v. State ex rel. Att'y Gen.*, 24 S.W. 397, 406–07 (Tex. 1893) (reversing a trial court's grant of leave to file where the conduct complained of did not state a violation of the antitrust statute on which the attorney general relied).

Moreover, the legislature—although it must do so "expressly," Tex. Const. art. IV, § 22—remains at liberty to materially limit or abolish quo warranto in any given circumstance. A motion for leave to file a quo warranto action should be denied if, on its face, it falls within such an express legislative prohibition. Leave could similarly be denied if the face

of the filing shows a violation of an unambiguous venue requirement or other legal mandate.

In other words, there are multiple ways in which a filing might fail to "state[] a cause of action" for which quo warranto is available. *See City of Orange*, 274 S.W.2d at 888. If for that or other reasons the attorney general cannot establish that "there is probable ground for the proceeding," Tex. Civ. Prac. & Rem. Code § 66.002(d), the trial court may deny leave to file.

In comparing this *filing hurdle* to various pretrial dispositive motions, we do not, of course, prejudge how any properly filed pretrial dispositive motion would fare with respect to the sufficiency of the attorney general's factual or legal allegations. Precisely because the choice to allow a quo warranto filing requires such deference and pretermits the kind of factual and legal scrutiny that will come later, granting leave to file such an action has no preclusive effect on a court's consideration, for example, of a Rule 91a motion. All such ordinary tools of civil litigation remain available to any target of a quo warranto action. Many of those procedural devices, like Rule 91a motions, are comparatively new and were not available during most of quo warranto's history in Texas, so it is not surprising that our cases do not mention them. Contemporary litigation, including in this context, must be governed by the prevailing rules of procedure.

Returning to the present case, most of Annunciation House's evidentiary arguments are therefore beside the point at this early stage. Annunciation House briefed this appeal almost as a miniature trial on the merits, asking that we assess (among other things) whether the

Fourth Amendment right to privacy applies to Annunciation House's premises or may be asserted by the shelter's director to defeat an alien-harboring charge. We may not resolve those questions on a direct appeal from the denial of leave to file, and we are particularly hesitant to do so where our jurisdiction was invoked by altogether separate defects in the trial court's *injunctive* rulings. Instead, for purposes of this appeal, we must take as true what the attorney general has alleged in his pleadings and decide only whether those allegations "state a cause of action" allowing quo warranto to proceed based on an alien-harboring charge. *City of Orange*, 274 S.W.2d at 888.

Turning to the pleadings, we take the attorney general to allege that Annunciation House (1) provides shelter to illegal aliens; (2) is aware that many of its guests are illegally present; (3) refuses to cooperate with law enforcement or permit law enforcement to enter its shelters at all to protect its illegally present guests from detection; and (4) purposefully, knowingly, and systematically shields illegal aliens from detection. Annunciation House protests that the allegations in fact amount to merely providing shelter to migrants, not doing what the statutes actually forbid: knowingly "encourag[ing] or induc[ing] a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection." Tex. Penal Code § 20.05(a)(2); *see also id*. § 20.07(a)(1) (making it an offense to "use any real estate . . . or other property" to violate § 20.05).

Annunciation House is certainly correct on one point, as the attorney general now agrees: that merely providing shelter to persons who happen to be migrants, regardless of their legal status, does not violate

39

the alien-harboring statute.  Both parties cite *Cruz v. Abbott*, in which the Fifth Circuit made an *Erie* guess that "harboring" under the statute "requires some level of covertness well beyond merely renting or providing a place to live."  849 F.3d at 599.  Characterizing the attorney general's allegations as criminalizing "merely . . . providing a place to live" to migrants, Annunciation House claims the conduct the attorney general alleges cannot be criminal, and thus cannot support the motion for leave, under *Cruz*'s limiting construction of the alien-harboring statute.

We agree with Annunciation House's premise but not its conclusion.  In our view, *Cruz* correctly read the alien-harboring statute's scope as not including the mere provision of shelter.  *Cruz* was an *Erie* guess, but an informed one, and it reasonably credited the legislature with knowing that the language it enacted has been repeatedly used in other statutes and repeatedly given a construction that goes beyond providing the essentials of life to someone:

> This court interprets the words "harbor, shield, or conceal," which appear in a federal immigration statute, to mean that "something is being hidden from detection."  We recently reaffirmed our understanding of that language in *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 529 (5th Cir. 2013) (en banc).  Although our precedent is not binding on Texas courts when interpreting Texas statutes, it is reasonable to assume that the legislature was aware of these decisions.  A number of other circuits have interpreted similar language to suggest that something is being hidden from detection.

*Id.* at 600 (internal citation and footnotes omitted).  We confirm that in adopting the alien-harboring ban, the legislature did not purport to criminalize the mere provision of food, shelter, or other means of survival, but it instead criminalized knowing efforts to thwart the detection of

40

those illegally present in our country—which is what harboring is. The line may occasionally seem thin or blurry, but at least in principle, as the State concedes, the distinction between *harboring* and merely providing shelter is real.

That reading of §§ 20.05(a)(2) and 20.07(a)(1) may, as the facts develop, require resolving the case for Annunciation House. But not yet, because we read the attorney general's petition below and his briefs in this Court to paint Annunciation House as violating the statute as *Cruz* interpreted it. We take the attorney general to allege a case of "hamper[ing] authorities from finding any of the illegal aliens [Annunciation House] . . . serve[s]," as well as "tak[ing] steps to help the aliens evade 'detection' by the authorities," precisely as *Cruz* contemplated. *Id*. at 602.

Annunciation House protests that, in context, what the attorney general characterizes as intentional and purposeful concealment is nothing more than the provision of shelter and the reasonable assertion of Fourth Amendment rights. The problem, however, is that weighing competing views of the evidence, let alone the merits of any constitutional objections based on a particular view of the evidence, is premature. We hold that the attorney general's allegations of violations of the alien-harboring statute are sufficient to satisfy § 66.002(d)'s "probable ground" requirement. The trial court erred by denying leave to file the quo warranto action on this ground.

Of course, as the case proceeds on remand, all the usual evidentiary objections, along with the ability to marshal evidence in its defense, will be available to Annunciation House. As with a ruling on a

pretrial dispositive motion, our taking these allegations as true at this stage hardly suggests that they are all accurate or that they will be proven. *See Hunnicutt*, 12 S.W. at 108. But the question before us is simply whether the case may be filed in the first place, and the asserted insufficiency of the allegations does not provide a basis to deny the attorney general leave to do so.

### 3

The trial court ruled that a quo warranto action based on the alien-harboring statute was also impermissible under RFRA. Annunciation House, joined by several amici, defends that ruling in this Court because "[c]losing Annunciation House would substantially burden its free exercise of religion" and because "closure would not merely 'significantly modify' Annunciation House's provision of shelter—it would *end* it." Further, Annunciation House argues, such a closure would not constitute "the least restrictive means to achieve" whatever interest the State might have. Annunciation House emphasizes its religious affiliation as part of the Roman Catholic Church and its Catholic mission to help impoverished migrants. The attorney general argues that, assuming RFRA applies to quo warranto at all, it is satisfied, including because the State has a compelling interest in enforcing the immigration laws of this State against Annunciation House. At the very least, he argues, RFRA's application is premature. We conclude that in the present posture of the case, RFRA is an improper basis for the district court to have denied the attorney general leave merely to file the quo warranto counterclaim. For the same reason, it would be improper at this stage for us to further opine on the significant RFRA issues that the parties so heatedly debate.

42

RFRA applies when "a government agency . . . substantially burden[s] a person's free exercise of religion." Tex. Civ. Prac. & Rem. Code § 110.003(a). To survive RFRA scrutiny, the government agency must "demonstrate[] that the application of the burden to the person" both "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." *Id.* § 110.003(b). RFRA may apply either as an affirmative "defense in a judicial or administrative proceeding," *id.* § 110.004, or as an affirmative claim, *see id.* § 110.005(a). Annunciation House invoked RFRA as an affirmative defense, initially to the attorney general's records request and later to the attorney general's motion for leave to file a quo warranto counterclaim and request for injunctive relief.

For purposes of today's decision, we assume without deciding that applying RFRA's protections does not conflict with Article IV, § 22's clear-statement rule, and we thus presume that RFRA operates just as fully in quo warranto proceedings as in any other civil-litigation context. But whether and to what extent RFRA applies in such proceedings are separate questions from whether the trial court erred when it agreed with Annunciation House that RFRA compelled it to deny the attorney general leave to file the quo warranto counterclaim.

At this stage, as we have held, determining whether to grant leave to file a quo warranto action does not involve weighing the evidence or reaching the ultimate merits of the claim. We address only whether the attorney general may even file an information putting his allegations before the trial court in the first place. The parties' RFRA arguments, by contrast, debate this case's ultimate merits and vigorously dispute

43

specific facts. On the one hand, Annunciation House emphasizes its mission, its religious motivation, the consequences that might be imposed if the attorney general could secure the ultimate relief that he seeks, and similar matters. On the other, the attorney general focuses on the serious problems at the border, the compelling nature of the government's interest, his doubts that Annunciation House's challenged conduct has a sufficient nexus to its religious mission, the reasons that he is entitled to the relief he seeks, and the like.

If the merits of Annunciation House's affirmative RFRA defense were before the Court, these arguments would be relevant to our ultimate determination. As we have confirmed, "RFRA requires that 'courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue.'" *Barr v. City of Sinton*, 295 S.W.3d 287, 306 (Tex. 2009) (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 439 (2006)) (finding "no basis for distinguishing" between RFRA and its federal counterpart in this regard). The statute "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* (quoting *O Centro Espírita*, 546 U.S. at 430–31). In other words, a granular focus on the specific facts, practices, and interests on both sides is by design inescapable in making a RFRA determination, at least when such matters are disputed.

The problem with using RFRA to deny leave to file here, therefore, is obvious. The parties' RFRA debate focuses on the remedy the attorney

44

general ultimately seeks—shutting down Annunciation House—and the merits of his request. But the questions before us are not whether the attorney general can prove that Annunciation House violated the alien-harboring act or whether, if it did, charter revocation is the proper remedy under Civil Practice and Remedies Code § 66.003. Necessarily, then, we cannot resolve any debates about the nature of Annunciation House's mission or the State's interests.

Said differently, the relevant government action for purposes of applying RFRA here is not the charter revocation that may or may not arrive, but only the *filing* of the quo warranto information. Engaging in litigation is generally not itself the sort of burden that RFRA forecloses—RFRA purposefully provides a tool to be deployed within litigation. In this case, it has been invoked as an affirmative defense focusing not on the mere existence of the litigation but on a potential end result of that litigation. Undoubtedly, RFRA can be powerful however it is deployed, and its potency often may be felt quite early. But it is not a tool to convert a proceeding focused on whether litigation may even commence into one that reaches and resolves ultimate issues. Were we to say more about RFRA at this stage, we would have to reach issues that go well beyond the narrow question of the attorney general's authority to file a quo warranto counterclaim—and to do so without the benefit of a sufficiently developed record or even the refining that ordinarily comes through the usual litigation and appellate process.

At the same time, we should not be misunderstood as categorically barring recourse to RFRA early in the litigation process. RFRA need not be used only defensively but can be invoked as a basis to secure an

45

injunction. RFRA is a testament to Texans' deep respect for religious liberty, which may require terminating government action before the government has had the opportunity to infringe at all. We recently reiterated as much in *Hensley v. State Commission on Judicial Conduct*, which authorized an affirmative RFRA claim to proceed where a state commission had used a public warning to threaten future adverse action. 692 S.W.3d 184, 185–86 (Tex. 2024). Even then, however, the RFRA claim—despite being brought affirmatively—had to proceed through the normal litigation process. *See id.* at 199–201. RFRA arguments should be resolved as soon as practicable once an adequate record exists and once the procedural posture of the case allows the court to proceed to such merits inquiries. This basic principle of law does not preclude relief in cases like *Hensley*, where the initial stages of litigation make clear that the facts are essentially undisputed, allowing the court to expeditiously resolve any RFRA questions as a matter of law.

We therefore decline to further address the parties' distinct RFRA questions, which may unfold below in the normal course. The parties have made helpful arguments regarding RFRA in general and in this case, and we appreciate the valuable contributions of amici, including by the presentation of oral argument focused on RFRA. We foreclose full consideration of none of these arguments on remand at any proper stage.

### 4

The trial court further ruled that even assuming the attorney general could prove that Annunciation House violated the alien-harboring statutes, federal law precludes relying on those violations in a quo warranto information. Specifically, it held that both the harboring

46

and stash-house provisions of the alien-harboring statute are field and conflict preempted by federal law and unconstitutionally vague as applied to Annunciation House. Annunciation House defends both rulings.

**a**

As to field preemption, Annunciation House simply cites *Arizona v. United States*, 567 U.S. 387 (2012), without further elaboration in this Court. As to conflict preemption, Annunciation House points to 8 U.S.C. § 1324(a)(1)(A)(iii), the federal alien-harboring statute, asserting that it is "impossible" to comply with both that provision and Penal Code § 20.05(a)(2). Annunciation House also contends that § 20.05(a)(2)'s enforcement would frustrate "the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (citation omitted).

We assume for purposes of our decision that federal preemption can be a proper basis for denying leave to file a quo warranto action. After all, if on the face of the pleadings it is clear that the only asserted basis for quo warranto is a state law that is unenforceable under the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, then it is hard to see how the proposed action could state a valid claim. But even adopting that premise, we disagree with the trial court and Annunciation House that the Texas alien-harboring statute can be regarded as preempted and thus bar the filing of this quo warranto action.

First, as to field preemption, "in order to determine whether Congress has implicitly ousted the States from regulating in a particular field," the Supreme Court has "first identif[ied] the field in which this is said to have occurred." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). The trial court's single sentence on preemption is not of much help here, and

Annunciation House is similarly vague about what "field" is preempted in its briefing, mentioning "the federal government's alien registration scheme" at one point but otherwise focusing on conflict preemption. Of course, the alien-harboring statute says nothing about alien *registration* and cannot be credibly compared to the preempted statute in *Arizona* that criminalized failure to carry federally approved identification. *See* 567 U.S. at 400. And Annunciation House cannot possibly mean that any state criminal law touching on immigration whatsoever is preempted, a view the Supreme Court roundly rejected in *Garcia*. *See* 589 U.S. at 212; *see also De Canas v. Bica*, 424 U.S. 351, 354–55 (1976) ("But the Court has never held that every state enactment which in any way deals with aliens is . . . *per se* pre-empted by this constitutional power, whether latent or exercised."). Even defining the field so narrowly as "anti-harboring," the attorney general points out that at least one federal court of appeals has held that quite circumscribed domain not to be preempted, reasoning that 8 U.S.C. § 1324 cannot alone be treated as a "framework of regulation so pervasive" as to oust the states entirely. *See Keller v. City of Fremont*, 719 F.3d 931, 943 (8th Cir. 2013) (quoting *Arizona*, 567 U.S. at 399). Absent any compelling argument that the alien-harboring statute treads upon a field within which Congress has forbidden states to act, we reject Annunciation House's arguments on that point.

Second, as to conflict preemption, we see this case as analogous to, and controlled by, *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582 (2011). In that case, the Supreme Court upheld an Arizona statute that mirrored federal law by "prohibit[ing] 'knowingly' employing an unauthorized alien." *Id.* at 601 (quoting both 8 U.S.C. § 1324a(a)(1)(A)

48

and Ariz. Rev. Stat. § 23–212(A)). Like the Penal Code provisions at issue here, the Arizona statute "cover[ed] only knowing or intentional violations" and "adopt[ed] the federal definition of who qualifie[d] as an 'unauthorized alien.'" *Id.* at 601, 605–06 (comparing 8 U.S.C. § 1234a(h)(3) with Ariz. Rev. Stat. § 23–211(11)). Far from a reason to *find* preemption, the Supreme Court lauded this close tracking of federal law as showing that there "[could] by definition be no conflict between state and federal law as to worker authorization." *Id.* at 601; *see also Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*, 134 F.4th 326, 335 (5th Cir. 2025) ("If anything, parallel standards, which ensure that the same primary conduct is regulated *in the same way*, pose reduced risk to federal enforcement priorities as compared to non-parallel standards, which regulate the same primary conduct *in different ways*."). Texas's alien-harboring statute is essentially identical in this important respect, as Penal Code § 20.05(a)(2) forbids only harboring those "remain[ing] in this country in violation of federal law."

Annunciation House argues that *Whiting* is distinguishable, as the statute there provided for civil rather than criminal penalties and complied with a federal saving clause allowing for some state regulation. *See* 563 U.S. at 596 (describing the Arizona law as "comfortably within the [federal] saving clause"). As we have already noted, *Garcia* made clear that state criminal law is not an inherently suspect category in preemption analysis. 589 U.S. at 212. And insofar as *Whiting* relied on the federal saving clause, it did so for the *express*-preemption argument raised there before *separately* ruling that the provisions were not impliedly preempted either. *See* 563 U.S. at 600 ("As an alternative to its express preemption argument,

49

the Chamber contends that Arizona's law is impliedly preempted because it conflicts with federal law."). Because Annunciation House cannot show that compliance with both federal law and the alien-harboring statute is "a physical impossibility," *Arizona*, 567 U.S. at 399 (citation omitted), the statute is not conflict preempted on that ground.

Finally, we turn to whether Texas's alien-harboring statute "stands as an obstacle to the . . . full purposes . . . of Congress." *Id.* (citation omitted). "We proceed with great hesitation when asked to construe statutory text based on the statute's purpose, particularly when the statute never expresses its purpose." *Malouf*, 694 S.W.3d at 730. Neither with respect to the particular statute that it invokes, 8 U.S.C. § 1324(a), nor federal immigration law more broadly, has Annunciation House identified a statutory statement of purpose. Instead, it abstracts a highly generalized congressional purpose of forbidding state roles in immigration enforcement. We, by contrast, ascertain a statute's purpose based on what the statute says rather than how in the abstract we might describe the motives of the legislative body that enacted it. *See, e.g., Univ. of Tex. at Austin v. GateHouse Media Tex. Holdings II, Inc.*, ___ S.W.3d ___, 2024 WL 5249449, at *6 & n.64 (Tex. Dec. 31, 2024); *Morath v. Lampasas ISD*, 686 S.W.3d 725, 737 & n.42 (Tex. 2024); *Gabriel Inv. Grp. v. Tex. Alcoholic Beverage Comm'n*, 646 S.W.3d 790, 798 (Tex. 2022). Absent that presuppositional guardrail, "implied obstacle preemption invites judges to imagine what the unexpressed 'purposes and objectives' of Congress might have been and speculate about whether there is tension between those purposes and state law that rises to the level of an 'obstacle.'" *Horton v. Kan. City S. Ry. Co.*, 692 S.W.3d 112, 148 (Tex.

2024) (Busby, J., concurring).

Fortunately, however, the Supreme Court has made the analysis simpler where nebulous "purposes" allegedly foreclose areas of traditional state power, such as quo warranto proceedings and criminal law. In those circumstances, "Congress should make its intention 'clear and manifest'" for such a result to follow. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (citation omitted). When examining the statute itself, and not a purposivist gloss on it, we find the opposite of such a "clear and manifest" intention. Rather than expressing a "purpose" to wholly exclude the states from immigration enforcement, or even to achieve that goal in practice, the statute instead includes an *affirmative authorization* of state enforcement of the federal alien-harboring statute in 8 U.S.C. § 1324(c), which empowers "all . . . officers whose duty it is to enforce criminal laws" to make arrests for "a violation of any provision of this section." This saving clause includes state officers, who have been conducting arrests under the federal alien-harboring statute for at least fifty years. *See, e.g., United States v. Olivares*, 496 F.2d 657, 659 (5th Cir. 1974) (involving an illegal-alien detention conducted by local El Paso County law enforcement). Annunciation House claims that enforcing the statute risks upsetting its working relationship with federal immigration authorities, but the Supreme Court has clearly distinguished between "Laws of the United States," which are protected by the Supremacy Clause, and "the criminal law enforcement priorities or preferences of federal officers," which are not. *Garcia*, 589 U.S. at 212.

Without more, a state enactment precisely tracking federal law does not make compliance with both "impossible" or inherently frustrate

51

"the full purposes and objectives of Congress" in enacting the latter, *Arizona*, 567 U.S. at 399 (citation omitted), at least where that federal law *already* invites state officers to enforce it, *see* 8 U.S.C. § 1324(c). As such, we hold that Texas's alien-harboring statute is neither field nor conflict preempted such that it could not serve as a plausible basis for the attorney general's quo warranto filing.

**b**

The trial court also held that the alien-harboring statute, as applied to Annunciation House via the quo warranto information, would render both that statute and the quo warranto enabling statute "unconstitutionally vague in violation of due course of law and therefore unenforceable," citing Article I, § 19 of the Texas Constitution and *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425 (Tex. 1998). The order's references to only the Texas Constitution, to "due course of law" (rather than to the federal Constitution's phrase, "due process"), and to only a decision of this Court suggest only a state-law basis for the challenge. *Benton*, however, turned entirely on federal law, and the parties' arguments also primarily cite federal authorities. For example, the attorney general observes that "Texas courts generally hold [the Fourteenth Amendment's due-process clause] to be similar to our State's due-course-of-law provision." Accordingly, without any distinct argument concerning the scope of the Texas Constitution, we will assume for present purposes that the anti-vagueness requirements of the two clauses are the same.

Annunciation House takes the trial court's vagueness holding to mean two things. First, it says, applying the alien-harboring statute to

Annunciation House on these facts would violate *Cruz*'s limiting construction of the statute and deprive the shelter of fair notice of what the statute means by "harboring." Second, it contends that allowing the attorney general to base quo warranto filings on criminal law would violate the constitutional rule "that a legislature establish minimal guidelines to govern law enforcement," and risk unleashing the attorney general "to pursue [his] personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted). The first point is resolved by our holding that, taken as true, the attorney general's allegations *do* fall within *Cruz*'s limited definition of "harboring." Annunciation House itself argues that adopting that definition "avoids issues of unconstitutional vagueness," and we readily agree.

As to the vagueness challenge to quo warranto *enforcement* of the alien-harboring statute, we cannot accept Annunciation House's constitutional argument. It is undoubtedly true that a statute may be unconstitutionally vague where "it fails to give fair notice of what conduct may be punished" and where its "language is so unclear that it invites arbitrary or discriminatory enforcement." *Tex. Dep't of Ins. v. Stonewater Roofing, Ltd.*, 696 S.W.3d 646, 660 (Tex. 2024). Focusing on the second part of this formula, Annunciation House argues that permitting the attorney general to pursue criminal-law violations by corporations in quo warranto actions vests him with unlimited discretion to conduct a "standardless sweep" of corporate charters. *Kolender*, 461 U.S. at 357 (citation omitted). We disagree.

Initially, we note that Annunciation House cites no authority for the proposition that supporting quo warranto filings with criminal acts

53

violates due process; instead, it relies on cases that involved ordinary prosecutions like *Kolender*, civil disputes like *Stonewater Roofing*, or attorney sanctions like *Benton*. Given the long history of quo warranto actions based on criminal-law violations in American law, *see supra* Part II.B.1.b, it is unsurprising that there is no authority for that mechanism's categorical unconstitutionality.

Moreover, we do not see the attorney general's ability to pursue violations of clearly defined criminal laws either by direct prosecution or by a quo warranto information as remotely comparable to the blank-check authority that a vague statute offers—the power to prosecute essentially anyone for anything. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding unconstitutionally vague an ordinance where "no standard of conduct is specified at all"). What Annunciation House declares an unconstitutional grant of sweeping authority is, in our view, essentially indistinguishable from an ordinary exercise of discretion, which (although not wholly impervious to attack in certain circumstances) is usually consistent with due process, as the U.S. Supreme Court has long held both generally and even in relation to quo warranto specifically. *See United States v. Batchelder*, 442 U.S. 114, 124 (1979) (acknowledging the "settled rule" that "whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion"); *see also Standard Oil Co. of Ind. v. Missouri ex inf. Hadley*, 224 U.S. 270, 289 (1912) ("Separate proceedings may be instituted,—one to secure the civil judgment, and the other to enforce the criminal law. Both cases may involve a consideration of the same facts; and evidence warranting a judgment of ouster may be sufficient to

54

sustain a conviction for crime.").

So long as "the ordinary person exercising ordinary common sense can sufficiently understand" what a criminal law prohibits, *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers AFL-CIO*, 413 U.S. 548, 579 (1973), no constitutional vagueness problem arises from the possibility that either criminal prosecution or quo warranto proceedings may follow. We therefore hold that neither the alien-harboring statute nor the quo warranto filing's reliance on that statute was unconstitutionally vague as applied to Annunciation House.

\* \* \*

In short, we find no lawful reason to categorically forbid the attorney general from filing a quo warranto action here. The writ's long history, our precedents, and constitutional text confirm that explicit legislative authorization of the remedy is not a prerequisite to that filing. Nor does any constitutional doctrine or statutory provision independently bar the filing. As such, the trial court erred in refusing the attorney general's request for leave to file his quo warranto counterclaim, and we reverse its order doing so.

### III

Even that is not enough to finally dispose of this appeal, which also includes a challenge to the trial court's order enjoining the attorney general from submitting any further records requests to Annunciation House. The trial court held that §§ 12.151 and 12.152 of the Business Organizations Code, which authorize such requests, are facially unconstitutional, and the attorney general disputes that conclusion. The parties also disagree over whether the records-request dispute has been mooted. We hold that the dispute is not moot and that the statute

55

is not facially unconstitutional.

## A

First, we consider whether the records-request dispute is moot.  If so, that conclusion would have no effect on the separate dispute over quo warranto that we addressed in Part II but would affect only the discrete issue about the injunction concerning records requests.

The attorney general argues that he ceased pressing his records request to Annunciation House well before the trial court ruled on it, thus rendering the dispute moot.  Alternatively, he argues that a different trial-court ruling, in which the trial court itself referred to the records request as "moot," rendered the records dispute at least "procedurally moot," citing our decision in *ERCOT, Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 637 (Tex. 2021).  Annunciation House argues that the records dispute is not moot, as the attorney general remains free to simply file more requests if there is no ruling that deems the relevant requests unconstitutional.

We agree with Annunciation House that this dispute is not moot. "Voluntary abandonment" of a challenged action "provides no assurance" that the action will not recur and typically cannot render a case moot. *Matthews ex rel. M.M. v. Kountze ISD*, 484 S.W.3d 416, 419–20 (Tex. 2016); *see also United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). We see no way to characterize the attorney general's purported relinquishment of his records requests below as anything but a voluntary abandonment of the challenged conduct.  That conclusion is particularly warranted here, where the attorney general simultaneously claims to have abandoned the challenged conduct *and* appeals a court

56

order enjoining that conduct. It is not "*impossible* for a court" to grant Annunciation House relief from allegedly unconstitutional requests even as the attorney general pursues his legal right to file such requests in this very court. *See Abbott v. Mexican Am. Legis. Caucus*, 647 S.W.3d 681, 689 (Tex. 2022). We hold that the records-request controversy is not moot and that we therefore have jurisdiction to reach its merits.

## B

On the merits, the trial court ruled that the statutes authorizing the attorney general's initial records requests to Annunciation House, codified at §§ 12.151 and 12.152 of the Business Organizations Code, are facially unconstitutional. It also ordered that any further records requests to Annunciation House be filed within this litigation, that the same district court would retain jurisdiction over the case, that the district court would conduct precompliance review as to any new requests, and that this injunction would remain in effect for two years. Because the injunction against further requests was grounded in the trial court's constitutional ruling, we turn to that ruling first.

## 1

Section 12.151 grants the attorney general authority "to inspect, examine, and make copies, as [he] considers necessary[,] . . . of any record" of a corporation. Section 12.152, in turn, states that the attorney general "shall make a written request to a managerial official" when examining the business of a corporation, "who shall *immediately* permit the attorney general to inspect, examine, and make copies" of the relevant records. (Emphasis added.) It is undisputed that the attorney general's agents who initially arrived at Annunciation House produced such a

written request and demanded compliance immediately.  It is also undisputed that the agents threatened Annunciation House's staff with forfeiture of their corporate charter to secure that compliance, citing the records-request statute's penalty provision.  *See* Tex. Bus. Orgs. Code § 12.155 (stating that a filing entity that "fails or refuses to permit the attorney general to examine or make copies of a record . . . forfeits the right of the entity to do business").

The controlling case on this question, both parties agree, is *City of Los Angeles v. Patel*, 576 U.S. 409 (2015).  There, the City of Los Angeles defended an ordinance requiring that hotel records "shall be made available to any officer of the Los Angeles Police Department for inspection." *Id.* at 413.  Hotel owners who refused to provide that access could "be arrested on the spot" and face six months in jail and a $1,000 fine. *Id.* at 421.  The City defended this scheme to the hilt, arguing that the ordinance could not be read to "afford[] hotel operators *any opportunity whatsoever*" for precompliance review of any records requests, as any such opportunity "would [have] fatally undermine[d] the scheme's efficacy by giving operators a chance to falsify their records." *Id.* at 421, 427 (emphasis added).  The Supreme Court held that the ordinance was facially unconstitutional because it foreclosed what the Fourth Amendment required: "an opportunity to obtain precompliance review before a neutral decisionmaker," only after which penalties like arrest could attach. *Id.* at 420.  Without prescribing the exact form such review must take, the Court firmly rejected the no-review-whatsoever approach, emphasizing the potential for the unbounded ordinance to "be used as a pretext to harass hotel operators and their guests." *Id.* at 421.

58

Annunciation House argues that §§ 12.151 and 12.152 operate identically to the Los Angeles ordinance and are thus similarly unconstitutional. Specifically, it argues that § 12.152's requirement that "managerial official[s] . . . *immediately* permit" inspection provides no opportunity for precompliance review before the penalties outlined in §§ 12.155 and 12.156 attach, including the drastic penalty of forfeiture of business privileges. In reply, the attorney general asks us not to read the requirement to produce records "immediately" literally and to instead hold that it inherently provides a reasonable time to comply. As for the availability of precompliance review, the attorney general points out that Annunciation House received such review here via a protective order, as authorized by Rule of Civil Procedure 176.6(e), and that such review is available to any "person commanded to . . . permit inspection and copying of designated documents." As the Supreme Court did not specify the exact form precompliance review must take, *see Patel*, 576 U.S. at 422–23, the attorney general claims that this procedure satisfies the Fourth Amendment.

We conclude that §§ 12.151 and 12.152 are not facially unconstitutional. At the outset, we note that this Court "must construe statutes to avoid constitutional infirmities." *City of Fort Worth v. Rylie*, 602 S.W.3d 459, 468 (Tex. 2020); *accord Quick*, 7 S.W.3d at 115. As we read *Patel*, the opinion does not proscribe administrative subpoenas and requests generally or even forbid the attachment of penalties for failure to comply. 576 U.S. at 422–23. Nor do we read the opinion's categorical rejection of Los Angeles's essentially unreviewable records-request ordinance to mandate cumbersome mechanisms for precompliance

59

review. *Id.* As the attorney general's inspection power therefore does not *inherently* contravene the Fourth Amendment, the only question before us is how to read § 12.152's requirement that inspection and production occur "immediately" upon a written request.

Both to dispel any specter of unconstitutionality and because it best interprets the statute within the larger context of Texas law, we hold that "immediately" in § 12.152 does not exclude the opportunity for precompliance review before associated penalties attach. Instead, it mandates the maximum possible expedition, which would be undermined by a set deadline (such as "within ten days"). Specifically, we agree with the attorney general that the term cannot reasonably be read literally, as in requiring compliance "without lapse of time, without delay," or "instantly." *Immediately*, Random House Dictionary of the English Language (1987 ed.). Otherwise, no business owner who receives a written request under § 12.152 could comply—providing physical documents without even a momentary delay is a physical impossibility. In other words, the question is not truly whether "immediately" can be read in the literal sense of "instantaneously," but *what* delay is permissible within the meaning of the term as deployed in its context.

In answering that question, "it is our duty to uphold the validity of [a] statute if it can be given a reasonable construction that will render it constitutional." *Rowan Drilling Co. v. Sheppard*, 87 S.W.2d 706, 707 (Tex. 1935). And when construing statutes against an existing legal background, "we presume that the legislature uses statutory language 'with complete knowledge of the existing law and with reference to it.'" *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 106–07 (Tex. 2021)

60

(citation omitted). The Fifth Circuit relied on that principle in *Cruz*, *see supra* Part II.B.2, and we make use of it again here. In this context, the presumption of legislative familiarity requires no great leap. Though § 12.152 was originally a provision of the Texas Miscellaneous Corporation Laws Act, 57th Leg., R.S., ch. 205, art. 5.02, 1961 Tex. Gen. Laws 408, 415, it was re-enacted as part of the newly organized Business Organizations Code, *see* Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1 sec. 12.152, 2003 Tex. Gen. Laws 267, 408. At that time, Rule 176.6(e) already governed administrative records requests, so the legislature presumably understood any requirement that records be produced "immediately" as subject to background legal principles. And, importantly, Rule 176.6(e) specifically provided that protective orders may be sought "before the time specified for compliance." Tex. R. Civ. P. 176.6(e).

With all that in mind, we do not read the legislature's decision to require production "immediately" as one that allows literally no time whatsoever to comply. Instead, to direct that production occur as soon as practicable, the statute simply avoids specifying a precise deadline that governs all cases. That reading allows the attorney general flexibility in deciding when to mandate compliance—but it does not permit him to withhold precompliance review altogether, whether by Rule 176.6(e)'s protective orders or other provisions of Texas law. Nothing in the text of § 12.151 or § 12.152 restricts that review, by protective orders or otherwise, nor would we fulfill our judicial duty to constitutionally construe the statute by placing such a problematic gloss on the text. *See Rylie*, 602 S.W.3d at 468. We accordingly hold that §§ 12.151 and 12.152 satisfy the Fourth Amendment's requirement for precompliance review

as outlined in *Patel*. The trial court therefore erred in holding that these provisions are facially unconstitutional.

We also note that the trial court grounded its injunction against further requests in the attorney general's supposed anti-Catholic bias against Annunciation House, and it held that the requests ran afoul of the "Save Chick-fil-A Law" codified at Government Code § 2400.002. Annunciation House has not defended that ruling in this appeal. In the record before us, we find no evidence to support the notion that the attorney general pursued Annunciation House "based wholly or partly on" the shelter's association with the Roman Catholic Church or the Christian faith more generally. Tex. Gov't Code § 2400.002.

Having already stated the general rule that coordinate branches of government receive a presumption of good faith, we note that *Von Dohlen v. City of San Antonio* specifically applied that presumption to accusations of adverse action under § 2400.002. 643 S.W.3d 387, 396 (Tex. 2022) ("Rather than assume the City would violate Chapter 2400, we presume the City would *comply* with Chapter 2400, until the contrary is shown."). Absent any evidence that the attorney general's actions were motivated by Annunciation House's Catholic practices rather than a suspicion that it violated state criminal law, we disagree with the trial court that § 2400.002 justified the injunction here.

\*   \*   \*

Correcting the legal error underpinning the injunction requires that the resulting injunction be vacated. *See Tex. Educ. Agency v. Hous. ISD*, 660 S.W.3d 108, 116 (Tex. 2023) ("A trial court has no discretion to misapply the law, however, and thus we review its legal determinations de novo."). Two extraordinary aspects of the injunction that we vacate,

62

however, warrant further discussion so that they do not affect the case on remand.

First, we note the injunction's unusual and broad scope. The trial court imposed a precompliance requirement on the attorney general with respect to future efforts to request to examine Annunciation House's records. The court then claimed for itself the exclusive authority for the next two years to supervise such precompliance. "[I]njunctions must be narrowly drawn and precise." *Holubec v. Brandenberger*, 111 S.W.3d 32, 40 (Tex. 2003) (quoting *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992)). To put it mildly, it is doubtful whether requiring a constitutional officer of this State to solicit permission from a district court before exercising his authority to request information relevant to the conduct of a Texas corporation could satisfy these requirements.

Second, throughout its brief order granting the injunction in favor of Annunciation House, the trial court chastised the attorney general and attacked his motivations for investigating Annunciation House. The court accused him, for example, of using the requests "as a pretext to justify [his] harassment," of "cho[osing] to harass a human rights organization," and of "selectively interpret[ing] or misus[ing] those [laws] that can be manipulated to advance his own personal beliefs or political agenda." On remand, we remind the trial court of its "duty to extend to the [attorney general]—a member of a coordinate branch—a presumption of regularity, good faith, and legality." *Webster*, 704 S.W.3d at 501. That respect is owed to the coordinate branches by every level of the judiciary, just as the judiciary expects the other branches to respect orders and judgments that emanate from our branch of government. We do not, of

63

course, ask the trial court to turn a blind eye to any evidence of bias or wrongdoing if Annunciation House presents it on remand; rather, we emphasize that courts must begin a case with the "presumption that the [attorney general], no less than the judiciary, intends to comply with the Constitution" unless and until evidence of such a serious accusation is actually presented. *Borgelt*, 692 S.W.3d at 303.

The injunction largely rests on the constitutional and statutory errors that we have resolved with respect to Business Organizations Code §§ 12.151 and 12.152. Formally vacating an injunction for one reason does not necessarily imply that everything else about the injunction was proper, as these comments illustrate. Given our disposition, however, we need not further examine these or other points.

**2**

Finally, we address the attorney general's requested injunction to halt Annunciation House's operations. We note that the attorney general has largely abandoned any request for such affirmative relief directly from this Court as part of this appeal. To the extent the trial court denied this injunction because of its above-considered rulings regarding quo warranto's unavailability in this case, of course, that denial also rested upon legal error. *Tex. Educ. Agency*, 660 S.W.3d at 119. Faced with an injunction denial that was legally erroneous, but without any compelling argument that such an injunction ought to be granted now, we therefore reverse and remand the denial of the attorney general's injunction to the trial court. Whether the attorney general may receive any injunctive relief against Annunciation House's operations, even as he pursues his information in the nature of quo warranto, is not before us.

64

## IV

The trial court erred in denying the attorney general leave to file an information in the nature of quo warranto.  The trial court likewise erred in granting Annunciation House a permanent injunction against records requests by the attorney general.  Finally, the trial court's order denying the attorney general's request for injunctive relief relied on legal error concerning the nature of quo warranto; should the attorney general renew that request, the trial court must assess it in light of our holdings.  The judgment of the district court is reversed, the injunction it granted is vacated, and the case is remanded for further proceedings consistent with this opinion.  We express no view as to the course or outcome of those further proceedings.

_____
Evan A. Young
Justice

**OPINION DELIVERED:** May 30, 2025

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Pauline Sisson on behalf of Abigail Smith
Bar No. 24141756
pauline.sisson@oag.texas.gov
Envelope ID: 101795341
Filing Code Description: Letter
Filing Description: 20250609 States Ltr to Ct re Supp Authority  Ex A
Status as of 6/9/2025 4:01 PM CST

Associated Case Party: Nonparty Patient No. 1

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Logan | 24106214 | wlogan@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Evan Lewis | 24116670 | edlewis@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Jervonne Newsome | 24094869 | jnewsome@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Thanh Nguyen | | tdnguyen@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Olivia Wogon | | owogon@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Jonathan Hung | | JOHung@winston.com | 6/9/2025 3:30:14 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
| David Phillips | | DPhillips@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Jamie Vargo | | JVargo@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
| Melinda Pate | | melinda.pate@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
| Houston Docket | | ecf_houston@winston.com | 6/9/2025 3:30:14 PM | SENT |
| Hollie Albin | | hmalbin@winston.com | 6/9/2025 3:30:14 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David G. Shatto | | david.shatto@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Pauline Sisson on behalf of Abigail Smith
Bar No. 24141756
pauline.sisson@oag.texas.gov
Envelope ID: 101795341
Filing Code Description: Letter
Filing Description: 20250609 States Ltr to Ct re Supp Authority  Ex A
Status as of 6/9/2025 4:01 PM CST

Associated Case Party: State of Texas

| Rob Farquharson | | rob.farquharson@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
|---|---|---|---|---|
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
| Ian Bergstrom | | Ian.Bergstrom@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |
| Amy Pletscher | | amy.pletscher@oag.texas.gov | 6/9/2025 3:30:14 PM | SENT |